EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ramón Pacheco Torres y Claribel Rodríguez Canchani<br><br>Recurridos<br><br>v.<br><br>Estancias de Yauco, S.E. y Yauco Excavation Contractors<br><br>Peticionarios | Certiorari<br><br>2003 TSPR 148<br><br>160 DPR \_\_\_\_ |

Número del Caso: CC-2000-916

Fecha: 30 de septiembre de 2003

Tribunal de Circuito de Apelaciones:
                         Circuito Regional V

Juez Ponente:
                    Hon. Antonio J. Negroni Cintrón

Abogado de la Parte Peticionaria:
                    Lcdo. Juan M. Aponte Castro

Abogada de la Parte Recurrida:
                    Lcda. María Elsa Sánchez Santiago

Materia: Vicios de Construcción

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Ramón Pacheco Torres y
Claribel Rodríguez Canchani

    Recurridos

      v.                          CC-2000-916        Certiorari

Estancias de Yauco, S.E. y
Yauco Excavation Contractors

    Peticionarios


Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 30 de septiembre de 2003.

Los aquí peticionarios recurren ante nos de una sentencia emitida por el Tribunal de Circuito de Apelaciones, la cual, a su vez, revocó una resolución dictada por el Departamento de Asuntos del Consumidor en un procedimiento iniciado por una querella sobre vicios de construcción. El foro apelativo intermedio dictaminó que los vicios reclamados en la querella por los aquí recurridos eran ocultos y ordenó a los aquí peticionarios el pago de la correspondiente compensación. Nos corresponde determinar si los vicios en cuestión se reputan aparentes por estar manifiestos, aún cuando los adquirentes no pudieran comprender que se trataba de un vicio de la construcción hasta que intervino un ingeniero que contrataron para inspeccionar la residencia. Se hace necesario, además, determinar si los vicios que sufre la estructura en cuestión provocan su ruina funcional. Veamos.

I

El señor Ramón Pacheco Torres y la señora Claribel Rodríguez Canchani, en adelante los adquirentes, compraron una propiedad en la Urbanización Estancias de Yauco, del Municipio de Yauco, Puerto Rico. Los vendedores de dicha propiedad fueron Estancias de Yauco, S.E. y Yauco Excavation Constructors, en adelante los vendedores.[1] El precio de venta de dicha propiedad fue de setenta y siete mil cien dólares ($77,100).[2] Surge de los autos ante nos que los adquirentes inspeccionaron la propiedad en cuestión al menos dos veces antes de aceptarla y no notificaron los defectos objeto de la presente controversia a los vendedores.

Por motivo de que en la marquesina de la casa se le estancaba el agua, los adquirentes contrataron los servicios del ingeniero Julio E. Caraballo Caraballo el 1 de abril de 1998. Le solicitaron que realizara un estudio de niveles en su residencia.[3] Luego de realizar el correspondiente estudio de la residencia, el ingeniero Caraballo Caraballo encontró graves fallas de construcción.[4] Entre las faltas descubiertas se encuentran las siguientes: (1) descuadre en los dormitorios y diferentes dependencias de la residencia, reflejados en las losetas y paredes de la misma; (2) pendiente del "driveway" que excede en un cuatro por ciento (4%) al máximo permitido, el cual es de catorce por ciento (14%); (3) ausencia de escalera en el área del "foyer" o

---

[1] Apéndice del recurso de <u>Certiorari</u>, pág. 67.

[2] Íd.

[3] Íd., pág. 68.

[4] Íd.

balcón, la cual consta en los planos aprobados por A.R.P.E.; y (4) la construcción de un enorme muro en la parte posterior del solar que no consta en el "plot plan" de la residencia.[5] El ingeniero concluyó que algunos de esos defectos eran insubsanables y otros podían ser corregidos.[6] **De la transcripción de la vista administrativa que obra en autos surge que el ingeniero Caraballo Caraballo declaró que los defectos de los que adolecía la residencia no podían ser reconocidos por una persona que no tuviera pericia en los asuntos de la construcción.**

El 27 de abril de 1998, los adquirentes radicaron una querella ante el Departamento de Asuntos de Consumidor, en adelante DACO, en la cual alegaron que su casa adolecía de los siguientes defectos: (1) descuadre interior en toda la residencia que se refleja en las losetas; (2) doble pared en área de comedor y dormitorio #3; (3) muro de contención más elevado que el de las demás residencias y que no está contemplado en el "plot plan"; (4) ausencia de escalera en el área del "foyer", la cual surge del "plot plan" y es necesaria debido a la elevación existente entre la residencia y la acera.  Solicitaron que DACO le ordenara a los vendedores la reparación de los vicios que fueran subsanables y que se les compensara por aquellos vicios insubsanables.[7]

El 20 de mayo de 1998, el señor José E. Vives, Inspector de DACO, realizó una inspección de la residencia en cuestión. Luego de esta inspección rindió un informe indicando que en efecto encontró que existían los defectos alegados y realizó

---

[5] Íd.

[6] Íd.

[7] Íd., pág. 13.

un estimado para la reparación de los mismos, que ascendía a la suma de veintiséis mil setecientos sesenta dólares con veinticinco centavos ($26,760.25).[8]

El 16 de febrero de 1999, se celebró la vista administrativa ante DACO en el caso de epígrafe. La Jueza Administrativa emitió la resolución en el caso el 27 de abril de 1999, copia de cuya notificación se archivó en autos ese mismo día.[9] Determinó el foro administrativo que la residencia se encontraba en estado de ruina funcional, toda vez que los defectos probados excedían la medida de las imperfecciones que se puede esperar en una construcción. Para llegar a dicha determinación, el referido foro tomó en consideración todos los defectos probados en conjunto, es decir, tanto los vicios ocultos como los vicios aparentes por incumplimiento de contrato[10]. Por lo tanto, concluyó el foro

---

[8] Íd., págs. 50-55.

[9] Íd., págs. 67-71.

[10] En dicha resolución, DACO dispuso lo siguiente:

> Los defectos probados en el presente caso exceden las medidas de imperfección. La pendiente del "driveway" excede en un 4% al máximo permitido que es de 14%. El descuadre interior de las losetas y paredes del interior de la residencia no tiene arreglo, a no ser que se construya nuevamente la casa. En cuanto a los defectos que afectan la utilización y disfrute de la propiedad, quedó probado que el enorme muro de contensión [sic] en la parte trasera del solar – que no constaba en los planos aprobados por ARPE- podía construirse de un tamaño menor sin afectar el disfrute del terreno y el espacio del mismo. También impide el disfrute de la edificación la falta de construcción de una escalera que da acceso al balcón y que constaba en los planos de la residencia aprobados por ARPE. Íd., pág. 69.

Concluyó, además, la referida agencia administrativa lo siguiente:

administrativo que los vendedores eran responsables por los vicios de construcción que sufría la residencia en cuestión, ya que los mismos estaban cubiertos por el plazo decenal que establece el Artículo 1483 del Código Civil.[11]     La resolución de DACO condenó a los vendedores a pagar la suma de cuatro mil seiscientos cincuenta y cinco dólares ($4,655) a los adquirentes por concepto de depreciación de la residencia por los vicios de los que adolece su estructura. Ordenó, además, la construcción de la escalera en el área del "foyer".

El 17 de mayo de 1999, los vendedores presentaron una moción de reconsideración ante DACO.  En la misma alegaron, en síntesis, que no aplicaba el Artículo 1483 del Código Civil, _supra_, a los vicios alegados, porque los mismos estaban manifiestos al momento en que los adquirentes

---

En el asunto que nos ocupa, entendemos que la parte querellante probó a nuestra satisfacción que los vicios de construcción presentes en su residencia cumplen con los requisitos de una ruina funcional, ya que resultaría oneroso corregir dichas imperfecciones o vicios, según la prueba presentada. Demostró que estos vicios que exceden de las imperfecciones que cabe esperar en una construcción le causan perjuicios, ya que deprecian el valor de propiedad. Además, estamos ante la presencia de un incumplimiento de contrato en vista de que parte de la obra no se ajusta a los planos aprobados por ARPE. Toda obligación consiste en dar, hacer o no hacer alguna cosa. Art. 1041 del Código Civil. En este caso el contratista debió construir una escalera en el área del foyer o balcón. La cual constaba en los planos aprobados por ARPE y no lo hizo. Por el contrario, la parte querellada se limitó a tratar de establecer que la querellante "conocía el estado de la unidad de vivienda y la aceptó tal cual estaba". Íd., págs. 69-70.

[11] 31 L.P.R.A. sec. 4124.

aceptaron la propiedad.[12]  La moción de reconsideración fue acogida por DACO y, como consecuencia, el 16 de agosto de 1999 emitió una nueva resolución dejando sin efecto la resolución original.  El foro administrativo determinó que los descuadres en la residencia y la pendiente del "driveway" eran **vicios aparentes**, por lo que al no reclamarlos dentro del plazo de dos (2) años que dispone la Ley Núm. 130 de 13 de junio de 1967,[13] y el Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico,[14] la acción caducó.  No obstante, DACO determinó que la falta de la escalera del "foyer" que aparecía en los planos aprobados por A.R.P.E. y la construcción del muro de contención que no aparecía en el "plot plan" constituían una violación contractual y ordenó la compensación a los adquirentes, ascendente a la suma de ochocientos dólares ($800) por ese concepto.  Copia de su notificación fue archivada en autos ese mismo día.[15]

Inconformes con la determinación de DACO, los vendedores acudieron ante el Tribunal de Circuito de Apelaciones, mediante recurso de revisión, el 15 de septiembre de 1999.[16] Ese mismo día acudieron ante el mismo foro los adquirentes mediante un recurso similar.[17]  Luego de varios trámites procesales, que incluyeron la consolidación de ambos recursos

---

[12] Apéndice del recurso de certiorari, págs. 72-77.

[13] 17 L.P.R.A. sec. 501 et seq.

[14] Reglamento Núm. 2268 aprobado el 17 de agosto de 1977.

[15] Apéndice del recurso de certiorari, págs. 78-81.

[16] Íd., pág. 82.

[17] Íd., pág. 1.

y la presentación de una exposición narrativa estipulada de la prueba, el foro apelativo intermedio dictó sentencia el 28 de agosto de 2000, archivándose en autos copia de su notificación el 30 de agosto del mismo año.[18] Dicho Tribunal concluyó que los vicios de construcción que fueron objeto de la querella eran vicios ocultos y provocaron la ruina funcional de la residencia, por lo que revocó la resolución de DACO dictada en reconsideración y confirmó la resolución original dictada por esa agencia.[19]

Los vendedores presentaron oportunamente una "Solicitud de Reconsideración" ante el Tribunal de Circuito de Apelaciones.[20] Por su parte, los adquirentes radicaron una "Réplica a Moción de Reconsideración" el 27 de septiembre de 2000.[21] Dicho Tribunal declaró no ha lugar la "Solicitud de Reconsideración", mediante resolución de 22 de septiembre de 2000, notificada a las partes y archivada en autos el 2 de octubre del mismo año.[22]

Inconformes con la determinación del foro apelativo intermedio, los vendedores acuden ante nos vía recurso de Certiorari presentado oportunamente, señalando como error cometido por dicho Tribunal lo siguiente:[23]

> Erró el [h]onorable Tribunal al aplicar el Artículo 1483 del Código Civil y al determinar que las condiciones de la residencia equivalen a una ruina funcional.

---

[18] Íd., pág. 196.

[19] Íd.

[20] Íd., pág. 216.

[21] Íd., pág. 225.

[22] Íd., pág. 223.

[23] Recurso de Certiorari, pág. 5.

Con el beneficio de la comparecencia de ambas partes, resolvemos.

## II

El umbral de nuestro análisis tiene que estar dirigido a evaluar y resolver si la residencia de los adquirentes se encuentra en estado de ruina funcional. Esta determinación es imperativa en este caso, ya que de no ser esa la situación, no sería de aplicación el Artículo 1483 del Código Civil, supra.

El referido Artículo 1483 del Código Civil, supra, establece la responsabilidad de un contratista por los vicios de construcción que provoquen la ruina del edificio.

El estatuto antes citado dispone lo siguiente:

> El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10) años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.

> Si la causa fuere la falta del contratista a las condiciones del contrato, la acción del [sic] indemnización durará quince (15) años.

Esta disposición estatutaria ha sido interpretada en varias ocasiones por esta Curia. Hemos resuelto que, para poder reclamar al amparo de ese artículo, el promovente tendrá que demostrar que los vicios que sufre el edificio ocasionan su ruina.[24] De la misma forma, hemos establecido la existencia de cuatro tipos distintos de ruina que puede

---

[24] Rivera v. A & C Development Corp., 144 D.P.R. 450 (1997); Maldonado Pérez v. Las Vegas Dev., 111 D.P.R. 573 (1981); Federal Ins. Co. v. Dresser Ind., Inc., 111 D.P.R. 96 (1981); Géigel v. Mariani, 85 D.P.R. 46 (1962).

sufrir un edificio, a saber: ruina total, ruina parcial, amenaza de ruina y ruina funcional.[25]

Cada una de estas categorías de ruina entrañan sus características propias. Existe ruina total cuando la misma compromete la solidez o estabilidad del edificio.[26] La ruina parcial provoca el derrumbamiento de uno de los elementos estructurales del edificio, pero no la totalidad del mismo.[27] La amenaza de ruina implica la degradación parcial de los elementos del edificio que, a su vez, compromete su solidez estructural o parte del mismo.[28]

A pesar de esto, no es necesario que los vicios de construcción que afectan un edificio amenacen su estabilidad para que se considere que el mismo está en ruina.[29] Se considera que **un edificio se encuentra en estado de ruina funcional** cuando los vicios de los que adolece: (1) amenazan la seguridad pública o estabilidad del edificio; (2) le causan un perjuicio grave al dueño; (3) tornan la obra en impropia para el uso a que se le destina; **o (4) exceden las medidas de las imperfecciones que cabe esperar razonablemente en una construcción.**[30] La presencia de cualquiera de estas situaciones en una construcción produce un estado de ruina funcional. El hecho de estar la estructura en ese estado no implica que estén amenazados de

---

[25] Rivera v. A & C Development Corp., supra.

[26] Fantauzzi v. Pleasant Homes, Inc., 113 D.P.R. 132 (1982).

[27] Íd.

[28] Íd.

[29] Federal Ins. Co. v. Dresser Ind., Inc., supra.

[30] Rivera v. A & C Development Corp., supra; y Fantauzzi v. Pleasant Homes, Inc., supra.

ruina sus elementos vitales. No obstante, se afecta severamente la utilización y disfrute de la misma.[31]

Una vez el dueño del edificio presenta prueba que demuestre que los vicios de construcción que sufre el edificio provocan alguno de los tipos de ruina antes mencionados, se activa una presunción de culpa y/o negligencia en contra del contratista que tuvo a su cargo la construcción.[32] Le corresponde entonces al contratista presentar prueba que demuestre la inexistencia de la ruina y/o que la misma no fue causada por su negligencia.[33] Por lo tanto, se trata de una presunción iuris tantum, la cual tiene que ser rebatida por la parte en contra de la cual opera la misma, o sea, el contratista.[34] Si no se presenta prueba para rebatir el hecho básico que da lugar a la presunción, el juzgador está obligado a dar por probado el hecho presumido.[35]

De la prueba desfilada en la vista administrativa se desprende que en efecto el edificio en cuestión en el caso de autos padece de ruina funcional. Definitivamente, los defectos de los que adolece dicho edificio exceden por mucho los que pueden esperarse razonablemente de una construcción similar. De la misma forma, los defectos restringen el uso que le pueden dar sus dueños (los adquirentes) a la estructura. Esta conclusión encuentra apoyo en el testimonio creído del perito presentado por los adquirentes ante DACO,

---

[31] Íd.

[32] Rivera v. A & C Development Corp., supra.

[33] Íd.

[34] Íd.

[35] Regla 14 de Evidencia, 32 L.P.R.A. Ap. IV, R. 14; Pueblo v. Vázquez Méndez, 117 D.P.R. 170 (1986).

el cual declaró que para poder corregir los descuadres en la residencia en cuestión habría que reducir su espacio interior, limitándose así el disfrute por parte de éstos de la misma.  No podemos perder de vista que al adquirir la residencia, los aquí recurridos tenían la expectativa de disfrutar de una cantidad determinada de pies cuadrados de espacio.

Los adquirentes se han visto imposibilitados de utilizar la marquesina de la residencia, por razón de que el declive en la entrada a la misma ("driveway") es mayor que el permitido en la industria.  Por eso, no pueden estacionar su automóvil dentro de la referida marquesina, viéndose obligados a dejarlo estacionado en la calle.  Tampoco han podido utilizar la entrada principal de la residencia que ubica en el balcón, por razón de la ausencia de la escalera que daría acceso de la acera al "foyer", tal y como aparece establecida en el plano de la residencia.  Por otro lado, el muro de contención construido en la parte posterior de la residencia, el cual no aparecía en el "plot plan", le imposibilita a los adquirentes el disfrute del predio constitutivo del patio posterior de la residencia que se les representó habrían de disfrutar una vez compraran el inmueble.

Las anteriores conclusiones están apoyadas por los testimonios del perito y de la señora Rodríguez Canchani en la vista administrativa ante DACO.[36]  La parte peticionaria (los vendedores) no aportó prueba alguna para refutar el hecho básico de que la residencia se encuentra en estado de

---

[36] Los referidos testimonios surgen de la copia de la transcripción de la vista que obra en autos.

ruina funcional, ni demostró que ese estado no se debió a su culpa o negligencia. Por esta razón, es necesario dar por probado el hecho presumido de que la ruina funcional de la residencia en efecto existe y que fue producida por los vendedores.

## III

Establecido que el edificio sobre el cual gira la controversia en este caso está en ruina funcional, nos corresponde determinar si los vicios de los cuales padecía eran aparentes. Veamos.

A pesar de que el Artículo 1483 del Código Civil, supra, no hace distinción entre vicios ocultos o aparentes a la hora de imponer responsabilidad al contratista por la ruina de un edificio, hemos establecido que una vez aceptada la obra dicha responsabilidad opera solamente para aquellos vicios de construcción que sean ocultos o que no hayan podido ser detectados al momento de comprar el bien inmueble.[37] No obstante, la determinación de qué constituye un vicio oculto no es tarea fácil ni existe una fórmula matemática que nos ayude a realizar el análisis crítico. Por esa razón, es necesario hacer la determinación caso a caso.[38]

---

[37] Constructora Bauzá, Inc. v. García López, 129 D.P.R. 579 (1991); Pereira v. I.B.E.C., 95 D.P.R. 28 (1967); González v. Agostini, 79 D.P.R. 510 (1956).

[38] A pesar de que en González v. Agostini, supra, establecimos la norma de que el Artículo 1483 del Código Civil, supra, aplica cuando se trata de vicios ocultos que provocan la ruina, la doctrina extiende la responsabilidad del contratista por la ruina de la estructura, aún cuando el vicio es aparente. Todo esto en función del interés público apremiante que existe detrás de dicha disposición estatutaria. Véase I. Rocca y G. Sabbatiello, Responsabilidades en la Construcción, Derechos y Obligaciones, Buenos Aires, Bias Editora, 1986; J. Herrera

Los vicios aparentes en una estructura, para efectos de la responsabilidad del contratista por ruina, son aquellos que son perceptibles a simple vista y que el dueño no puede evitar reconocer, a tenor con su pericia al momento de inspeccionar la obra.[39]   A esos efectos, expresamos en González v. Agostini, supra,[40] lo siguiente:

> Los autores franceses y la jurisprudencia de su país sostienen que para que el arquitecto o empresario sean responsables dentro del plazo de garantía fijado por la ley es condición que se trate de vicios ocultos. A juicio de algunos de ellos, la existencia de vicios aparentes que el propietario no ha podido ignorar en el momento de la recepción de la obra no implica responsabilidad alguna para el arquitecto o empresario. "Hay que presumir que una obra recibida sin reparos no tenía vicios aparentes". Si los vicios fueran aparentes de modo que el que examina y recibe las obras pudo reconocerlos, no se está ya en el caso del artículo que fija el plazo de garantía sino que se vuelve a la regla común según la cual la recepción de la obra descarga al obrero de la responsabilidad.
>
> La cuestión que discutimos tiene importancia en la decisión de este caso porque como se recordará, cuando el demandante recibió el edificio ya conocía los vicios de construcción que motivan esta reclamación de daños y perjuicios. Si la recepción se hubiera hecho a plena satisfacción o sin reservas, el contratista, conforme a la doctrina expuesta anteriormente, hubiera quedado libre de responsabilidad por los vicios manifiestos que eran conocidos por el propietario ya que dicha aceptación implicaba una renuncia a reclamar por tales vicios. No así en cuanto a los vicios ocultos. Pero según hemos visto, el demandante protestó de los vicios ostensibles que conocía e hizo la recepción del edificio sujeto a esa reserva. (Notas al calce omitidas.)

> ...

---

Catena, Responsabilidades en la Construcción, Granada: Gráficas del Sur, S.A., 1974, T. I, Vol. I.

[39] Constructora Bauzá, Inc. v. García López, supra; y González v. Agostini, supra.

[40] Págs. 520-521.

**La exención de responsabilidad que beneficia al contratista por los vicios aparentes, luego de la recepción de la obra, implica que el dueño de la misma los haya observado y reconocido como vicios de construcción al verificarse la inspección y recepción de la obra. Si el vicio de construcción está manifiesto y aparente, pero no puede ser reconocido como tal por el dueño de la obra por su falta de pericia al momento de aceptarla, el contratista no queda eximido de su responsabilidad.[41]**

Concluimos que parte de los vicios de los que adolecía la residencia en cuestión no podían ser reconocidos por los adquirentes por su falta de pericia. El perito de los aquí recurridos declaró en la vista administrativa que los descuadres interiores de la residencia, así como los problemas con el "driveway" no podían ser apreciados por una persona que no tuviera pericia en los aspectos de la construcción. Como cuestión de realidad, no se estableció en la vista ni tampoco en los escritos ante nos que la señora Rodríguez Canchani, la cual inspeccionó la residencia, tuviera la pericia para ello. La residencia fue aceptada sin reparos por la señora Rodríguez Canchani. No es hasta que se le comienza a acumular agua en la marquesina y que tienen problemas para subir su carro a la misma, que contrata un ingeniero para que la inspeccione. En el momento en que un profesional de la construcción le informa de la existencia de tales defectos, es que los mismos se

---

[41] La doctrina reconoce que, una vez aceptada la obra por el dueño, el contratista se libera de responsabilidad por aquellos vicios que hayan podido ser reconocidos por el dueño de la obra antes de aceptarla. Véase J.I. Rubio San Román, La Responsabilidad Civil en la Construcción, Madrid, Ed. COLEX, 1987.

manifiestan como aparentes a los aquí recurridos. Una vez advienen al conocimiento de los defectos de construcción de su residencia reclamaron la reparación de los mismos.

Debido al interés público que representa la industria de la construcción y el poderío económico de las empresas dedicadas a esa operación de negocios frente al consumidor, resulta injusto el imponerle a estos últimos la carga de pagar los honorarios de un perito que los acompañe a la hora de inspeccionar las estructuras que pretenden adquirir como su hogar. No podemos depositar sobre los hombros del consumidor el riesgo de perder su derecho a reclamar por los vicios de construcción que padece su residencia y que ocasionan su ruina, porque no pueden reconocer su manifestación por su falta de pericia. Es a los constructores de hogares a quienes les corresponde cumplir con los parámetros de calidad necesarios, y asegurarse que las viviendas que construyen, como un negocio lucrativo, puedan ser disfrutadas plenamente por los consumidores que las adquieren.

IV

Una vez establecido el hecho de que la residencia en cuestión se encuentra en estado de ruina funcional, nos corresponde analizar la razón por la cual, en este caso, no aplican las disposiciones del Reglamento de DACO número 2268, supra. En primer lugar, ese reglamento dispone, en su sección veinticinco (25), una cláusula de salvedad que establece que "[n]ada de lo dispuesto en este Reglamento se interpretará como una restricción, limitación o renuncia al derecho que por el Código Civil de Puerto Rico, o por

cualquier otra ley, se concede a los casos de reclamaciones cubiertas por este Reglamento".

La única disposición estatutaria, adicional al reglamento antes citado, que aplica en el caso ante nuestra consideración es el Artículo 1483 del Código Civil, _supra_, que dispone de las reclamaciones en casos de ruina en una estructura. Por lo tanto, el Reglamento Número 2268, _supra_, no restringe ni prohíbe que un consumidor, cuya residencia se encuentra en estado de ruina debido a vicios de la construcción, reclame al amparo de lo dispuesto en el Código Civil. Del texto del reglamento surge claramente, que el propósito del mismo es permitir en aquellos casos en que una residencia sufre de vicios de construcción, que el dueño pueda reclamar al contratista o desarrollador sin necesidad de probar que el edificio se encuentra en estado de ruina, como tendría que hacerlo en caso de presentar su reclamación al amparo del Artículo 1483 del Código Civil, _supra_.

En el caso ante nos, la situación es totalmente distinguible de aquellas cubiertas por el referido Reglamento. Se trata de una residencia que se encuentra en estado de ruina funcional, según lo demostrado por la prueba presentada en la vista administrativa, la cual no fue rebatida por los aquí peticionarios. Los vicios de los cuales adolecía la referida estructura estuvieron ocultos para los adquirentes por un tiempo mayor que el establecido por el referido reglamento, razón por la cual era imposible reclamar al amparo del mismo. Por lo tanto, tratándose de una situación fáctica totalmente distinta de aquella que provee el Reglamento Número 2268, _supra_, el mismo no es de aplicación en este caso.

En adición a los vicios arriba mencionados, la residencia en cuestión padecía de defectos de construcción que no se pueden reputar como ocultos, ya que éstos podían ser apreciados a simple vista. La ausencia de la escalera que debió dar acceso al "foyer" y la construcción del muro de contención en la parte posterior de la residencia, podían ser apreciados a simple vista. A pesar de que esos vicios de construcción eran apreciables a simple vista, el contratista no se liberó de su responsabilidad por los mismos con la aceptación de la residencia por los adquirentes. Veamos.

El Artículo 1483 del Código Civil, supra, en su segundo párrafo, dispone que "[s]i la causa [de la ruina] fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince (15) años". Esta disposición estatutaria extiende, mas allá del plazo decenal, el término que tienen los adquirentes de una estructura para reclamar contra el contratista los vicios de construcción que sufre la estructura, cuando los mismos son producto de una violación contractual.[42]

Al interpretar la referida disposición, esta Curia resolvió, en Federal Ins. Co. v. Dresser Ind., Inc., supra, que "para poder invocar el plazo de caducidad mayor **deberá probarse que la violación a una cláusula concreta del contrato o sus especificaciones fue la causa directa de la ruina del edificio**".[43] El peso de la prueba para demostrar

---

[42] Federal Ins. Co. v. Dresser Ind. Inc., supra.

[43] 111 D.P.R. 96, 108 (1981).

estas circunstancias recae en el dueño del edificio.[44] A esos

efectos, expresamos lo siguiente:

> Por tratarse de una cláusula punitiva, que tiene
> el extraordinario efecto de ampliar el plazo
> decenal, la prueba no podrá fundarse en simples
> inferencias derivables de la caída del ascensor.
> La falta del contratista tiene que ser probada por
> el comitente.[45]

Unos años más tarde, en Zayas v. Levitt & Sons of P.R.,

Inc.,[46] resolvimos que, para que se configure una acción bajo

el segundo párrafo del referido artículo, es indispensable

que se pruebe la existencia de un contrato de obra o de

construcción. Hemos definido el contrato de obra, también

denominado contrato de arrendamiento de obra o de ejecución

de obra, como sigue:

> En estos casos una parte, generalmente denominada
> "contratista", se compromete a realizar y entregar
> una obra o construcción según la misma fue
> contratada, mientras que la otra parte, el dueño,
> se obliga a pagar el precio convenido en la forma
> y el tiempo así pactado.[47]

Ahora bien, es menester evaluar y analizar en qué

circunstancias la aceptación del edificio por el dueño de la

obra libera al contratista de responsabilidad por los "vicios

aparentes". Juan Herrera Catena explica que la doctrina se

divide en dos posiciones: la que opina que la aceptación o

recepción definitiva libera de responsabilidad por los vicios

ruinógenos aparentes, pero no por los ocultos; y la que

postula que la recepción definitiva no cubre ningún vicio que

cause la ruina, ya sea éste oculto o aparente.[48] En cuanto a

---

[44] Íd.

[45] Íd.

[46] 132 D.P.R. 101 (1992).

[47] Constructora Bauzá, Inc. v. García López, supra, pág. 592.

la primera postura, Herrera Catena explica que sus
proponentes, aun cuando entienden que la recepción definitiva
cubre los vicios ruinógenos aparentes, "exigen a éstos tales
requisitos que hacen muy difícil la prueba de que el vicio en
cuestión tenga tal carácter".[49] Por su parte, Herrera Cantena
suscribe la segunda postura, explicando que el Artículo 1.591
del Código Civil español, Artículo 1483 nuestro, aplica
indistintamente a los vicios ocultos u aparentes, **siempre que
ocasionen la ruina del edificio**.[50] Concluye que el texto de
la referida disposición, en sus dos párrafos, no autoriza la
distinción entre vicios ruinógenos ocultos y aparentes.[51]
Señala, además, que las consideraciones de orden público que
apoyan la responsabilidad decenal impiden que la recepción
definitiva libere al contratista de responsabilidad por los
vicios ruinógenos aparentes.[52] Con relación al segundo
párrafo del referido artículo, Herrera Catena justifica su
conclusión de que la recepción definitiva no cubre ningún
tipo de vicio ruinógeno expresando lo siguiente:

> 1) Si el contratista y el arquitecto
> responden ante terceros, aunque se tratare de un
> vicio aparente en el momento de la recepción de
> obra no es (en nuestra opinión) porque el párrafo

---

[48] J. Herrera Catena, Responsabilidades en la Construcción, Responsabilidad Decenal de Técnicos y Contructores, V. I, 1983, pág. 86.

[49] Herrera Catena explica que los proponentes de la primera postura exigen los siguientes requisitos: (1) que el vicio sea aparente para el propietario, pudiendo éste por sí mismo, constatarlo y apreciar su importancia; y (2) que los vicios no hayan podido escapar a un no técnico, por ser evidentes en el momento de la recepción. Mas aún, algunos autores proponen que el contratista tenga el peso de la prueba para demostrar que los vicios eran aparentes al momento de la recepción del edificio, y el propietario conocía su existencia. Íd., págs. 86-87.

[50] Íd., pág. 93.

[51] Íd.

[52] Íd., págs. 93 y 101.

1.° del precepto contemple obligaciones de origen extracontractual, sino porque el art. 1909 del propio Código [Artículo 1809 del Código Civil de Puerto Rico] (típicamente extracontractualista) se remite al art. 1.591 (en sus dos párrafos), y no sólo a su párrafo 1.°), preceptuando que "si el daño de que tratan los dos artículos anteriores (ruina del 1.907 [Artículo 1.807 nuestro] y daños relacionados en el 1.908) [Artículo 1.808 nuestro]) resultare por defecto de construcción, *el tercero que lo sufra* sólo podrá repetir contra el arquitecto o, en su caso, contra el constructor, dentro del tiempo legal". Es indiferente que la causa (para responder ante terceros) sea una de las detalladas en el párrafo 1.° del art. 1.591 o "la falta del contratista a las condiciones del contrato" (a que se refiere el párrafo 2.° de este precepto); pues el genérico "defecto de construcción" (del art. 1909) se concreta en todas y cada una de las causas de ambos párrafos del art. 1.591, ...

...

2) Estimamos que el párrafo 2.° del art. 1.591 no viene a contradecir la doctrina tradicional sobre el carácter liberatorio de la recepción de obra, sino que, por el contrario, constituye uno de los supuestos de *excepcionalidad* (al principio general liberatorio) en que se desenvuelve dicho precepto, siquiera tenga un sentido *punitivo* y de agravación (respecto al párrafo 1.°) la ampliación del plazo de garantía decenal al de 15 años, que ya existiera en el Derecho romano y en nuestra Ley de Partidas, conservándose en el párrafo 2.° del precepto.[53]

A la luz de lo antes expuesto, forzoso es concluir que la recepción definitiva del edificio no libera al contratista de responsabilidad por los vicios que causan la ruina del inmueble, sean éstos ocultos o aparentes, cuando estos últimos perceptibles a simple vista constituyen un incumplimiento del contrato de construcción.

Del expediente surge que la escalera que habría de permitir acceso al "foyer" aparecía en los planos que aprobó A.R.P.E., por lo que era una obligación contractual de los vendedores construir la residencia, según lo disponen esos planos. No hacerlo constituyó una violación de los términos

y condiciones del contrato de parte de los vendedores para con los adquirentes. Por otro lado, el muro de contención que se construyó en la parte posterior de la residencia no constaba en el "plot plan". Al construirlo se limitó la cantidad de terreno que los adquirentes podían disfrutar y que en efecto compraron. Concluimos que los vendedores violaron los términos y condiciones contractuales pactados con los adquirentes. De acuerdo con lo dispuesto en el segundo párrafo del Artículo 1483 del Código Civil, supra, el término para entablar la reclamación, en esos casos, es de quince (15) años por producir los referidos "vicios aparentes", consecuencia del incumplimiento del contrato de construcción, junto a los vicios ocultos ya mencionados, la ruina funcional de la edificación construida para vivienda[54].

---

[53] Íd., págs. 96-97.

[54] Hemos aplicado el Artículo 1483, supra, en su segundo párrafo, pues, como mencionáramos anteriormente, los "vicios aparentes" por incumplimiento de contrato, junto a los vicios ocultos anteriormente mencionados, causaron el estado de ruina funcional de la vivienda. No obstante, aunque dicho artículo no aplicara con relación al incumplimiento de los términos y condiciones del contrato, el contratista respondería bajo el Artículo 1077 del Código Civil, 31 L.P.R.A. sec. 3052, el cual dispone lo siguiente:

> La facultad de resolver las obligaciones se entiende implícita en las [obligaciones] recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.
>
> El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.
>
> El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo.
>
> Esto se entiende sin perjuicio de los derechos de terceros adquirentes, con arreglo a las secs. 3496 y 3499 de este título, y las

VI

Es norma firmemente establecida que los tribunales apelativos han de conceder una gran deferencia a las decisiones administrativas, debido a que éstas cuentan con vasta experiencia y los conocimientos especializados en los asuntos que le han sido encomendados.[55] Hemos resuelto que en nuestra jurisdicción los procedimientos y las decisiones de las agencias administrativas gozan de una presunción de regularidad y corrección.[56] Por lo tanto, la persona que alegue lo contrario tendrá que presentar evidencia suficiente para derrotar tal presunción, no pudiendo descansar únicamente en meras alegaciones.[57]

La revisión judicial de una decisión administrativa suele circunscribirse a determinar si: (1) el remedio concedido por la agencia fue apropiado; (2) las determinaciones de hecho realizadas por la agencia están sostenidas por evidencia sustancial en el expediente

---

disposiciones de la Ley Hipotecaria y el Registro de la Propiedad, secs. 2001 *et seq.* del Título 30.

[55] T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 130 (1998).

[56] Rivera Concepción v. A.R.Pe., res. el 29 de septiembre de 2000, 2000 T.S.P.R. 143, 152 D.P.R. ___ (2000), 2000 J.T.S. 155; Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 761 (1999); Misión Ind. P.R. v. J.P., supra, pág. 130; Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975).

[57] Rivera Concepción v. A.R.Pe., supra; Com. Vec. Pro-Mej., Inc. v. J.P., supra, pág. 761; Misión Ind. P.R. v. J.P., supra, pág. 130; Henríquez v. Consejo Educación Superior, supra, pág. 210.

administrativo; y (3) las conclusiones de derecho fueron correctas.[58]

Con relación a las determinaciones de hecho de una agencia administrativa, esta Curia ha resuelto que "estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad".[59] Hemos definido evidencia sustancial como "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión".[60] El tribunal debe considerar la evidencia en su totalidad, tanto la que sostenga la decisión administrativa, como la que menoscabe el peso que la agencia le haya conferido.[61] Como explicáramos en Reyes Salcedo v. Policía de P.R., "la norma de la evidencia sustancial ... persigue evitar la

---

[58] Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2175; Artículo 17 (e) de la Ley Orgánica del Departamento de Asuntos del Consumidor, 3 L.P.R.A. sec. 341p (e); Rivera v. A & C Development Corp., 144 D.P.R. 450, 460-461 (1997).

[59] Asoc. Vec. H. San Jorge v. U. Med. Corp., res. el 19 de enero de 2000, 2000 T.S.P.R. 7, 150 D.P.R. ___ (2000), 2000 J.T.S. 21. Véase, además, Costa, Piovanetti v. Caguas Expressway, res. el 29 de diciembre de 1999, 99 T.S.P.R. 187, 149 D.P.R. ___ (1999), 2000 J.T.S. 11; Misión Ind. P.R. v. J.P., supra, pág. 131; Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, supra.

[60] Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 437 (1997); Misión Ind. P.R. v. J.P., supra, pág. 131; Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953).

[61] Misión Ind. P.R. v. J.P., supra, pág. 131; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, pág. 437; Hilton Hotels v. Junta de Salario Mínimo, supra, pág. 686.

sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor".[62] Conforme a la referida norma, el tribunal limita su intervención a evaluar si la decisión administrativa es razonable.[63] En caso de que exista más de una interpretación razonable de los hechos, el tribunal debe sostener la que seleccionó la agencia, y no sustituir su criterio por el de ésta. [64]

Por otra parte, las conclusiones de derecho pueden ser revisadas en todos sus aspectos por el tribunal.[65] No obstante, esto no significa que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de derecho de la agencia, sustituyendo el criterio de ésta por el propio.[66] Los tribunales le reconocen gran peso y deferencia a las interpretaciones hechas por la agencia administrativa de las

---

[62] 143 D.P.R. 85, 95 (1997).  Ver también P.R.T.C. v. R. Reg. Tel. de P.R., res. el 12 de junio de 2000, 2000 T.S.P.R. 83, 151 D.P.R. ___ (2000), 2000 J.T.S. 98.

[63] Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, pág. 437.

[64] Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra, pág. 437; J.R.T. v. Línea Suprema, Inc., 89 D.P.R. 840, 849 (1964).

[65] Artículo 4.5 de la Ley de Procedimiento Administrativo Uniforme, supra; O.E.G. v. Rodríguez y otros, res. el 1 de abril de 2003, 2003 T.S.P.R. 48, 159 D.P.R. ___ (2003), 2003 J.T.S. 51; P.R.T.C. v. R. Reg. Tel. de P.R., supra.

[66] P.R.T.C. v. R. Reg. Tel. de P.R., supra; Misión Ind. P.R. v. J.P., supra, pág. 132.

leyes de las que son custodios.[67] Dicha deferencia judicial al "expertise" administrativo, sin embargo, cede ante una actuación irrazonable o ilegal.[68] La interpretación de la agencia también cede cuando la misma produce resultados inconsistentes o contrarios al propósito del estatuto interpretado y a su política pública.[69]

En Rivera v. A & C Development Corp., supra, resolvimos que la conclusión de DACO respecto a que en un caso particular se configura la ruina funcional que hace aplicable el Artículo 1483 del Código Civil, supra, constituye una determinación mixta de hecho y de derecho. Por lo tanto, dicha determinación se trata como una conclusión de derecho, revisable en todos sus aspectos por los tribunales apelativos. En el caso de autos, el Tribunal de Circuito de Apelaciones revisó en todos sus aspectos la conclusión de DACO, en su resolución del 27 de abril de 1999, de que la residencia en controversia se encontraba en

---

[67] Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; Comisionado de Seguros v. Antilles Ins. Co., 145 D.P.R. 226, 233 (1998); Rivera v. A & C Development Corp., supra, pág. 461; Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020, 1042 (1992); De Jesús v. Depto. Servicios Sociales, 123 D.P.R. 407, 417-418 (1989).

[68] Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; Com. Vec. Pro-Mej., Inc. v. J.P., supra, pág. 761; Comisionado de Seguros v. Antilles Ins. Co., supra, pág. 233.

[69] Costa, Piovanetti v. Caguas Expressway, supra; Mun. de San Juan v. J.C.A., res. el 5 de octubre de 1999, 99 T.S.P.R. 141, 149 D.P.R. ___ (1999), 99 J.T.S. 152; Calderón v. Adm. Sistemas de Retiro, supra, pág. 1042; De Jesús v. Depto. Servicios Sociales, 123 D.P.R. 407, 418 (1989).

[70] Apéndice del recurso de Certiorari, pág. 214.

estado de ruina funcional. El referido foro concluyó lo siguiente:

> Como puede apreciarse de las partes citadas del informe [emitido por el ingeniero Caballero], considerados conjuntamente y en su totalidad, según fueron identificados y descritos en éste y consignados en la resolución original emitida por DACO a base de la prueba incontrovertida presentada por los Pachecho-Rodríguez, los desperfectos descritos no comprometen la solidez o estabilidad del edificio. Sin embargo, constituyen una ruina funcional de la residencia, por afectar seriamente la utilización y disfrute del inmueble y, sin lugar a dudas, exceder las imperfecciones que podían esperarse en una residencia nueva. Atendida la prueba desfilada, constituyen conjuntamente elementos de la ruina funcional de la vivienda y causan perjuicio considerable.[70]

Por lo tanto, el referido tribunal determinó que el remedio concedido por DACO en la resolución original era el procedente, por lo que revocó la resolución emitida en reconsideración y reinstaló el dictamen original. El peticionario no nos ha colocado en posición de intervenir con la presunción de regularidad y corrección que cobija las actuaciones y decisiones del Tribunal de Circuito de Apelaciones. Por lo tanto, la decisión recurrida debe sostenerse.

## VII

Por los fundamentos antes expuestos, procede confirmar la sentencia dictada por el Tribunal de Circuito de Apelaciones.

Se dictará sentencia de conformidad.

Efraín E. Rivera Pérez

---

[70] Apéndice del recurso de Certiorari, pág. 214.

Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ramón Pacheco Torres y
Claribel Rodríguez Canchani

      Recurridos

         v.                    CC-2000-916      Certiorari

Estancias de Yauco, S.E. y
Yauco Excavation Contractors

      Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 30 de septiembre de 2003.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta sentencia confirmando la emitida por el Tribunal de Circuito de Apelaciones el 28 de agosto de 2000.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García concurre y disiente con opinión escrita. El Juez Asociado señor Fuster Berlingeri concurre sin opinión escrita. La Jueza Asociada señora Naveira de Rodón no intervino.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ramón Pacheco Torres y
Claribel Rodríguez Canchani

    Recurridos

        vs.                              CC-2000-916      Certiorari

Estancias de Yauco, S.E.
Yauco Excavation Contractors

    Peticionarios

Opinión concurrente y disidente en parte, emitida por el Juez Presidente, señor Andréu García

San Juan, Puerto Rico, a 30 de septiembre de 2003

En el caso de autos, la Opinión del Tribunal extiende la protección del segundo párrafo del Artículo 1483 del Código Civil de Puerto Rico, 31 L.P.R.A. § 4124, para reclamar por vicios aparentes que no son causa de la ruina del edificio. Por estimar que incide el Tribunal al resolver de esa forma, nos vemos obligados a disentir en parte.

**I.**

Mediante contrato de compraventa efectuado el 18 de enero de 1995, los esposos Ramón Pacheco Torres y Claribel Rodríguez Canchani adquirieron de Estancias de Yauco, S.E. y de Yauco Excavation

Yauco, S.E. y de Yauco Excavation Contractors, Inc., una vivienda en la urbanización Estancias de Yauco. Antes de aceptar la misma, los compradores inspeccionaron la propiedad al menos dos (2) veces. En abril de 1998, luego de adquirida la propiedad, contrataron a un ingeniero para que hiciera un estudio de niveles en la residencia, ya que el agua se estancaba en el área de la marquesina. El estudio reveló las siguientes fallas de construcción: (1) descuadre en los dormitorios y diferentes dependencias de la casa, reflejado en las losetas y paredes de la residencia; (2) exceso de un cuatro por ciento (4%) del máximo permitido en la pendiente del garaje, el cual es de catorce por ciento (14%); (3) ausencia de escalera en la entrada de la casa (en el área del *"foyer"*); (4) existencia de un muro de contención en la parte posterior del solar que no consta en los planos.

El 27 de abril de 1998, el señor Pacheco y la señora Rodríguez presentaron una querella ante el Departamento de Asuntos del Consumidor ("D.A.C.O.") en la que alegaron que la residencia adolecía de los vicios señalados en el estudio realizado por el ingeniero; solicitaron que se corrigieran los vicios subsanables y que se les compensara por los vicios insubsanables. Un inspector de D.A.C.O. realizó una inspección de la residencia, comprobó la existencia de tales defectos y estimó que las reparaciones constarían $26,760.25. D.A.C.O. emitió una

resolución el 27 de abril de 1999, mediante la cual determinó que Estancias de Yauco, S.E. y Yauco Excavation Contractors, Inc., eran responsables por los vicios de construcción que sufría la residencia a tenor con las disposiciones del Artículo 1483 del Código Civil, 31 L.P.R.A. sec. 4124. Ordenó el pago de la suma de $4,655,00 por concepto de depreciación del valor de la residencia.

Posteriormente, D.A.C.O. reconsideró su dictamen y determinó que los vicios consistentes en el descuadre en el piso y las paredes y en el desnivel en la marquesina eran de carácter aparente, por lo cual no era de aplicación el Artículo 1483 del Código Civil, supra, y la acción para reclamar por tales vivios no procedía bajo la Ley Núm. 130 de 13 de junio de 19967, según enmendada, 17 L.P.R.A. secs. 501 et seq. y el reglamento aprobado por D.A.C.O.[71], debido a que la reclamación se debió de hacer en el plazo de dos (2) años. Sin embargo, D.A.C.O. determinó que la falta de la escalera del "foyer" que aparecía en los planos aprobados por A.R.P.E. y la existencia del muro de contención que no aparecía en el "plot plan", constituían una violación contractual, por lo cual la reclamación por tal incumplimiento no había caducado, ya que tiene un plazo de quince (15) años. Se ordenó una compensación de $800.00 a los querellantes.

Inconformes con tal determinación, tanto los vendedores como lo compradores acudieron ante el Tribunal de Circuito de Apelaciones mediante recursos de revisión. Luego de

---

[71] **"Reglamento para Regular las Distintas Actividades del Negocio de la Construcción de Viviendas Privadas en Puerto Rico", Regl. Núm. 2268 de D.A.C.O., aprobado el 17 de agosto de 1977.**

consolidar ambos recursos, el foro apelativo emitió sentencia el 28 de agosto de 2000, mediante la cual revocó la resolución recurrida e instauró la originalmente emitida por la agencia administrativa. Después de haber sido denegada la moción de reconsideración presentada por los vendedores, éstos acudieron ante nos señalando que erró el Tribunal de Circuito de Apelaciones "al aplicar el Artículo 1483 del Código Civil y al determinar que las condiciones de la residencia equivalen a una ruina funcional".

II

Coincidimos con la conclusión de la mayoría del Tribunal al efecto de que la residencia en cuestión se encuentra en estado de ruina funcional necesaria para activar la garantía decenal del Artículo 1483 del Código Civil, _supra_.

Concurrimos también con la determinación de la mayoría sobre los vicios ocultos.

Sin embargo, entendemos equivocado el razonamiento de la mayoría mediante el cual se aplica el segundo párrafo del Artículo 1483 del Código Civil, _supra_, a los vicios aparentes que no causan la ruina del edificio. Por considerar que la causa de acción por incumplimiento contractual contemplada en dicho estatuto no procede en el caso de autos, disentimos.

La regla de la responsabilidad decenal (primer párrafo del Artículo 1483 del Código Civil) se aplica al caso del edificio que se arruina por vicios de la construcción o de la dirección, supuestos concretos del mal cumplimiento de la obligación por falta de aplicación de la pericia exigible de los obligados. La regla de la responsabilidad quincenal (segundo párrafo del mismo artículo) se refiere al caso, más

genérico, de ruina causada por incumplimiento de las condiciones del contrato pero predicado exclusivamente del contratista. P. Salvador Coderch, en <u>Comentario del Código Civil</u>, Secretaría General Técnica, Centro de Publicaciones, Madrid, 1991, Tomo II, pág. 1189.

La doctrina discute si el fundamento de la responsabilidad es legal o contractual.[72]

Herrera Catena estima que se trata de una responsabilidad *"ex lege"* a la que habrá que aplicar, supletoriamente, el régimen contractual.[73] Esto significa que tales obligaciones son exigibles cuando existe un contrato de ejecución de obra y no figuren en una de sus cláusulas, toda vez que el Artículo 1210 del Código Civil, 31 L.P.R.A. sec. 3375, preceptúa que los contratos obligan "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso u a la ley". Y que igualmente lo son cuando no exista un contrato de ejecución de obra, pues la función desempeñada es la determinante de la responsabilidad.

Nos encontramos, en definitiva, dentro de las exigencias de la *"lex artis"* y no en el marco del incumplimiento

---

[72] **La tesis contractualista es seguida entre otros autores por Manresa, <u>Comentarios al Código Civil Español</u>, t. X, Madrid, 1950, pág. 1991. En la misma línea se encuentra Díez Picazo, <u>Estudios sobre Jurisprudencia Civil</u>, Edit. Tecnos, Madrid, 1966, pág. 629.**

[73] **J. Herrera Catena, <u>Responsabilidad Decenal de Técnicosos y Constructores</u>, Granada, 1974, Volumen I, pág. 195.**

específico de una cláusula contractual que constituye el ámbito del párrafo segundo del Artículo 1483.[74]

La doctrina española ha prestado escasa atención a la naturaleza jurídica de las responsabilidades del párrafo 2° del artículo 1591 del Código Civil español, equivalente Artículo 1483 del Código Civil de Puerto Rico. En general, el artículo 1591 es contemplado en su conjunto, sin distinción entre las responsabilidades nacidas de uno y otro párrafo.[75]

Uno de los pocos autores que ha estudiado con más detenimiento el precepto en cuestión es García Cantero, quien subraya que para interpretar debidamente el párrafo 2°. Del Artículo 1591, "hay que tener en cuenta que dicho segundo párrafo constituye una oración elidida que debe completarse con el primero", debiendo quedar la frase así: "*Si la causa de la ruina fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince (15) años*". La expresión "condiciones del contrato" utiliza un término no técnico, con el que quiere

---

[74] **Id., págs. 199-200.**

[75] **Así Manresa utiliza un lenguaje contractualista –refiriéndose al precepto en su conjunto– que sólo conviene al párrafo 2º del artículo 1591. Ob. cit., págs. 921 y 922. Mucius Scaevola lo contempla expresamente, conceptuándolo "excepción punitiva al plazo de garantía", poniendo de relieve que no tenía precedente en el Proyecto de Código Civil de 1851 y estimándolo innecesario, pues toda falta contractual (que sea causa de la ruina total o parcial de la obra) implicaría un vicio constructivo (ya sancionado en el párrafo 1º del Artículo 1591). M. Scaevola, <u>Código Civil</u>, Madrid, 1915, t. XXIV, págs. 103-104.**

aludirse al pliego de condiciones del contrato de obra. Se trataría, por tanto, de un *incumplimiento cualificado del contrato*, y en tal sentido dicha norma vendría a ser una aplicación tipificada del artículo 1101 (artículo 1054 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3018). Continúa diciendo García Cantero que se trata de incumplimiento *específico*; no bastaría cualquier clase de incumplimiento, sino el cualificado por su resultado, es decir, por haber originado la ruina del edificio construido; pero dicha ruina ha de provenir, precisamente, de la falta del contratista a las condiciones del contrato.[76]

Gullón Ballesteros se plantea la necesidad de una *integración* del párrafo 2° y precisa que se trata de una ruina producida "por no haberse cumplido *específicamente* lo pactado en el contrato de obra".[77]

Herrera Catena sostiene que se trata de un párrafo oscuro, pero no inútil, que sanciona contravenciones *específicamente contractuales*, constituyendo una *"excepción punitiva"* al plazo de garantía establecido en el párrafo 1° del propio Artículo 1591 (que amplía a 15 años), cuando la causa de la ruina fuere "la falta del contratista a las condiciones del contrato". El párrafo 1° del Artículo 1591 establece obligaciones de origen legal, sancionando

---

[76] **G. García Cantero, "La Responsabilidad por Ruina de los Edificios", 16 An. Der. Civ. 1053, 1110 (1963).**

incumplimientos de la *"lex artis"*; mientras que el párrafo 2° se contrae a incumplimientos específicos de las cláusulas contractuales, operando cuando la situación fáctica suponga vicio constructivo con arreglo a la *"lex artis"* y, *además*, falta contractual.[78]

En Federal Ins. Co. v. Dresser Ind. Inc., 111 D.P.R. 96, 107-108 (1981), aceptamos la interpretación más generalizada de la doctrina española según la cual el párrafo 2° del Artículo 1483 constituye una excepción punitiva al plazo decenal y que tiene una acepción muy restringida y resolvimos que "para poder invocar el plazo de caducidad mayor *deberá probarse que la violación de una cláusula concreta del contrato o sus especificaciones fue la causa directa de la ruina del edificio.* La carga de la prueba le corresponde al dueño o legitimado activo. [...] Por tratarse de un cláusula punitiva, que tiene el extraordinario efecto de ampliar el plazo decenal, la prueba no podrá fundarse en simples inferencias derivables... La falta del contratista tiene que ser probada por el comitente". (Citas omitidas, énfasis nuestro).

La doctrina establecida en Federal Ins. Co. v. Dresser Ind. Inc., supra, la reafirmamos más recientemente en Zayas v. Levitt & Sons of P.R., Inc., 132 D.P.R. 101, 111-113 (1992), y añadimos que además resulta indispensable probar la

---

[77] **Gullón Ballesteros, Curso de Derecho Civil. Contratos en Especial. Responsabilidad Extracontractual, Edit. Tecnos, Madrid, 1968, pág. 269.**

existencia de un contrato de obra o de construcción para que surja una causa de acción bajo el 2º párrafo del Artículo 1483 del Código Civil.

III

El vicio o vicios ruinógenos serán, muchas veces, ocultos en el sentido del Artículo 1373 del Código Civil, 31 L.P.R.A. § 3841, pero no por ello quedarán sustraídos a la acción por ruina, antes bien, ésta es una garantía reforzada del adquirente de la obra que se explica por el hecho de que el mal cumplimiento de las obligaciones de realizar o dirigir la obra no suelen revelarse inmediatamente.

El tema de la recepción de obra, es singularmente importante en situaciones del Artículo 1483, párrafo 2º. Dado que éste contempla "la falta del contratista a las condiciones del contrato" como causa de la ruina, es obvio que la recepción de obra (que implica un reconocimiento de que se admite ésta –la obra– por estar de acuerdo con el contrato) tendrá un singular relieve cuando se trate de responsabilidades derivadas del referido párrafo 2º del Artículo 1483[79].

¿Cubre la recepción definitiva los vicios ruinógenos aparentes? Esta interrogante ha dado lugar a dos posiciones

_____

[78] **J. Herrera Catena, ob. cit., págs. 219.**

[79] **La recepción "viene constituida por el acto o la manifestación del propietario, reconociendo que la obra ha**

sobre el particular: la que considera que la recepción definitiva *cubre* los vicios ruinógenos *aparentes* dejando en pie la responsabilidad por los vicios ruinógenos ocultos, y la que estima que la recepción definitiva no *cubre* ningún vicio ruinógeno (ni aparente ni oculto).

Herrera Catena, siguiendo a Manresa y a García Cantero, sostiene que tratándose de vicios ruinógenos nos encontramos ante la aplicación de normas de orden público, que impiden el efecto liberatorio de la recepción definitiva, incluso para los vicios aparentes en el momento de recibir la obra. Expresa este autor que cuando se trata de vicios ruinógenos es irrelevante la distinción entre vicios ocultos y aparentes. Si el contratista y el arquitecto responden ante terceros, aunque se trate de un vicio aparente en el momento de la recepción de obra, no es porque el párrafo 1° del precepto contemple obligaciones de origen extracontractual, sino porque el Artículo 1809 del Código Civil, 31 L.P.R.A. sec. 5148, se remite al Artículo 1483 en sus dos párrafos, y no sólo a su párrafo primero, preceptuando que "si el daño de que tratan los dos artículos anteriores (ruina del 1807 y daños relacionados del 1808) resultare por defecto de construcción, el tercero que lo sufra sólo podrá repetir contra el arquitecto o, en su caso, contra el constructor, dentro del tiempo legal". Es indiferente que la causa (para responder ante terceros) sea una de las detalladas en el párrafo 1° del Artículo 1483 o "la falta del contratista a las condiciones del contrato" a que se refiere el párrafo 2° de este precepto; pues el genérico "defecto de construcción"

---

**sido ejecutada correctamente". Sentencia del Tribunal**

del Artículo 1809 se concreta en todas y cada una de las causas de ambos párrafos del Artículo 1483. El párrafo 2° del Artículo 1483 no viene a contradecir la doctrina tradicional sobre el carácter liberatorio de la recepción de obra, sino que, por el contrario, constituye uno de los supuestos de *excepcionalidad* (al principio general liberatorio) en que se desenvuelve dicho precepto, siquiera tenga un sentido *punitivo* y de agravación (respecto al párrafo 1°) la ampliación del plazo de garantía al de 15 años, que ya existía en el Derecho romano y en la Ley de Partidas.

P. Salvador Coderch señala, por su parte, que las reglas de los vicios ocultos son propias de los contratos onerosos y no se ve razón para rechazar la acción de vicios del adquirente de una nueva que los denuncia en tiempo y forma. Por eso, quizá, la jurisprudencia española ha seguido una orientación pragmática: en ocasiones ha señalado que las acciones de vicios y la de ruina (y la de incumplimiento) son compatibles entre sí y cabe optar por una de ellas; otras veces y para rechazar la caducidad de la acción de vicios ocultos por haberse ejercitado transcurridos los seis meses desde la entrega, se ha afirmado que el Artículo 1591 es derecho especial en relación a la regulación general de los defectos ocultos, o que no opera el artículo 1490 (1379 del Código Civil de Puerto Rico, 31 L.P.R.A. § 3847) porque en el Artículo 1541 hay un caso de inhabilidad del objeto, o que los vicios ruinógenos gozan de autonomía en relación a los ocultos, o que entonces suponen, además, incumplimiento predominando en los últimos tiempos la doctrina que recalca que estos vicios que acarrean ruina e incumplimiento están

---

**Supremo español de 14 de octubre de 1968.**

sujetos al régimen especial del Artículo 1591 y al general del incumplimiento obligacional en vez del establecido en los Artículos 1484 y ss. (Art. 1373 del Sigo Civil de Puerto Rico, 31 L.P.R.A. §. 3841 y ss.). Dicho autor concluye que la responsabilidad por vicios aparentes se extingue con la entrega, pero no se considerarán tales aquellos de carácter ruinógeno cuya gravedad no pudiera ser todavía apreciada. P. Salvador Coderch, ob. cit. pag.1192.

Sin embargo, en el ámbito de los vicios no ruinógenos las cosas ocurren de otra forma. Al no existir las aludidas normas de orden público (obstaculizadoras del indicado efecto liberatorio de la recepción definitiva), cobra singular relieve la distinción entre vicios ocultos y aparentes a la hora de establecer responsabilidades por los no ruinógenos con posterioridad a la recepción de la obra[80].

La recepción de obra constituye un acto jurídico distinto de la convención inicial. La recepción de obra sin reserva libera al contratista de los vicios *aparentes* no ruinógenos.

Podemos concluir, sin duda, como lo hace Herrera Catena que el Artículo 1483 del Código Civil sólo contempla los vicios ruinógenos[81]. Y esto impide el efecto liberatorio de la recepción de la obra incluso para los vicios aparentes en el momento de recibir la obra.

_____

[80] **J. Herrera Catena, ob. cit., págs. 86-101.**

[81] **Id., pág. 132.**

En este sentido, estamos de acuerdo con la opinión de la mayoría cuando expresa que el Artículo 1483 del Código Civil no hace distinción entre vicios ocultos y aparentes a la hora de imponer responsabilidad al contratista por la ruina de un edificio, a pesar de lo expresado en Constructora Bauzá, Inc. v. García López, 129 D.P.R. 579 (1991) y en González v. Agostini, 79 D.P.R. 510 (1956).

IV

La mayoría concluye que la ausencia de la escalera que debió de dar acceso al "*foyer*" y la existencia del muro de contención de la parte posterior de la residencia constituyen vicios aparentes, pero que el contratista no se liberó de su responsabilidad por los mismos con la recepción de la obra por constituir una violación "a las condiciones del contrato", conforme establece el párrafo 2° de Artículo 1483 del Código Civil.

Considero que esta conclusión es claramente errónea porque para responsabilizar al contratista por tales defectos habría que sostener que los mismos son vicios ruinógenos. No existe prueba alguna para sostener que la ausencia de la escalera y la existencia del muro de contención sean vicios que produjeran la ruina del edificio.

Siendo esto así, la responsabilidad del contratista queda fuera del alcance del Artículo 1483 del Código Civil, supra.

Por otra parte, por tratarse de vicios aparentes no ruinógenos, es aplicable la regla general según la cual, la

responsabilidad del contratista cesa una vez entregada la obra.

Por este motivo, disiento de esta parte de la sentencia del Tribunal y los fundamentos de la opinión que la sostienen.


                                    José A. Andréu García
                                    Juez Presidente